IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| BRIAN LYNN LIPPERT, | ) | CASE NO.  3:25-CV-00076-JJH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | JUDGE JEFFREY J. HELMICK |
| vs. | ) | UNITED STATES DISTRICT JUDGE |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | MAGISTRATE JUDGE |
| SECURITY, | ) | JONATHAN D. GREENBERG |
| | ) | |
| Defendant. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |

Plaintiff, Brian Lippert ("Plaintiff" or "Lippert"), challenges the final decision of Defendant, Frank Bisignano,[1]  Commissioner of Social Security ("Commissioner"), denying his applications for Period of Disability ("POD"), Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and Recommendation.  For the reasons set forth below, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

## I.  PROCEDURAL HISTORY

In March 2022, Lippert filed an application for POD, DIB, and SSI, alleging a disability onset date of August 22, 2012, and claiming he was disabled due to gastritis, adrenal gland disorder/gland tumor, irritable bowel syndrome, degenerative disc disease, high blood pressure, memory problems, anxiety, PTSD, depression, and inability to handle yelling or loud noises.  (Transcript ("Tr.") 16, 66.)  The

---

[1] On May 7, 2025, Frank Bisignano became the Commissioner of Social Security.

1

applications were denied initially and upon reconsideration, and Lippert requested a hearing before an administrative law judge ("ALJ"). (*Id.* at 16.)

On July 28, 2023, an ALJ held a hearing, during which Lippert, represented by counsel, and an impartial vocational expert ("VE") testified. (*Id.*) On October 27, 2023, the ALJ issued a written decision finding Lippert was not disabled. (*Id.* at 16-31.) The ALJ's decision became final on November 27, 2024, when the Appeals Council declined further review. (*Id.* at 1-7.)

On January 15, 2025, Lippert filed his Complaint to challenge the Commissioner's final decision. (Doc. No. 1.) The parties have completed briefing in this case. (Doc. Nos. 8, 10-11.) Lippert asserts the following assignments of error:

> (1)  In evaluating Plaintiff's anxiety, the ALJ failed to adequately evaluate the supportability of the Prior Administrative Medical Findings and to adequately develop the record concerning the functional impact of Plaintiff's anxiety.
>
> (2)  The ALJ failed to adequately evaluate the opinion evidence concerning Plaintiff's need for an emotional support animal, leaving the ALJ's resultant decision without the support of substantial evidence.

(Doc. No. 8.)

## II.  EVIDENCE

### A.  Personal and Vocational Evidence

Lippert was born in March 1971 and was 52 years-old at the time of his administrative hearing (Tr. 16, 29), making him a "person closely approaching advanced age" under Social Security regulations. *See* 20 C.F.R. §§ 404.1563(d), 416.963(d). He has at least a high school education. (Tr. 29.) He has past relevant work as a sales attendant and security guard. (*Id.*)

**B.      Relevant Medical Evidence[2]**

On May 1, 2015, Lippert saw Brady Decker, NP, with complaints of abdominal pain and reported he had recently become more anxious; "he ha[d] gone his whole like [sic] without health problems and all of a sudden he has developed issues with BP, gastritis, and the adrenal mass."  (*Id.* at 1832, 1834.) Lippert told Decker he wanted to address anxiety in the future.  (*Id.* at 1832.)  On examination, Decker found Lippert alert, anxious, cooperative, well-groomed, and fully oriented.  (*Id.* at 1833.)  Lippert told Decker about the medications he had received at Bellevue and wanted to be seen in the future to discuss his anxiety.  (*Id.* at 1834.)

On May 22, 2015, Lippert saw Rachel Brooks, NP, for a blood pressure check and reported he was "very anxious at times," mainly when his gastritis was acting up.  (*Id.* at 1827, 1829.)  Lippert told Brooks he worried about how he was "always having stomach pains."  (*Id.* at 1827.)  On examination, Brooks found Lippert alert, anxious, cooperative, well-groomed, not depressed, and fully oriented.  (*Id.* at 1828.)

On July 9, 2015, Lippert saw Brooks for evaluation of gastroenteritis and reported he still became anxious when his abdominal pain began.  (*Id.* at 1818, 1820.)  Lippert told Brooks that Xanax had helped in the past.  (*Id.* at 1818.)  On examination, Brooks found Lippert alert, anxious, cooperative, well-groomed, not depressed, and fully oriented.  (*Id.* at 1819.)  Brooks prescribed hydroxyzine for anxiety. (*Id.* at 1820.)

On November 2, 2015, Lippert saw Brooks for follow up regarding his abdominal pain.  (*Id.* at 1803.)  On examination, Brooks found Lippert alert, anxious, cooperative, well-groomed, not depressed, and fully oriented.  (*Id.*)

On June 1, 2016, Lippert saw John Imm, M.D., regarding his gastritis.  (*Id.* at 1774.)  On

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.  In addition, as Lippert challenges only the ALJ's mental findings, the Court further limits its discussion of the evidence to Lippert's mental impairments.

examination, Dr. Imm found Lippert alert, cooperative, and not anxious or depressed.  (*Id.*)  Dr. Imm noted that since Lippert was "not eating gas forming foods," Lippert was "probably swallowing air from mold pain or his anxiety."  (*Id.* at 1775.)  Dr. Imm noted he would not treat Lippert's anxiety until the pain had been diagnosed and treated.  (*Id.*)

On August 15, 2016, Lippert saw Melissa Lanza, Ph.D., for a consultative psychological evaluation.  (*Id.* at 1145.)  Lippert reported he had applied for disability benefits because he had "'severe stomach problems,'" but told Dr. Lanza that "'the doctors say I have severe anxiety so that's why I'm here.'"  (*Id.*)  Lippert stated he panicked because of his medical symptoms.  (*Id.* at 1146.)  Lippert denied difficulty learning job duties, working at a required pace, or getting along with others at work.  (*Id.* at 1147.)  Lippert reported his primary care physician prescribed as needed anxiety medication that Lippert took when his anxiety became "'really severe.'"  (*Id.*)  He endorsed almost daily anxiety because he never feels well.  (*Id.*)  Lippert told Dr. Lanza he usually would not take his anxiety medication, preferring to lay in bed until it passed.  (*Id.*)  He reported that the most common trigger for his anxiety was his medical symptoms.  (*Id.*)  Other triggers included crowded stores and crying babies.  (*Id.*)  Sometimes he would wake up anxious.  (*Id.*)  Lippert denied any admissions for inpatient psychiatric treatment.  (*Id.*)  Lippert could perform activities of daily living, including grocery shopping, although he went with his wife, and they shopped late at night to avoid crowds.  (*Id.*)  Lippert enjoyed reading, playing video games, spending time with his family, watching movies, and playing with kittens in their home.  (*Id.*)

On examination, Dr. Lanza found appropriate appearance, appropriate eye contact, calm behavior, slightly fast speech, logical and goal-oriented thought process, full affect, full orientation, sufficient insight and judgment, and memory recall as expected for his age.  (*Id.* at 1148-49.)  Dr. Lanza noted she observed no anxiety symptoms during the examination.  (*Id.* at 1148.)  Dr. Lanza diagnosed Lippert with generalized anxiety disorder.  (*Id.* at 1149.)  Dr. Lanza opined that if Lippert were to become employed at

4

this time, "he may experience an increase in anxiety symptoms in response to stressful situations," but did not opine as to any limitations in any other functional area. (*Id.* at 1149-50.)

On December 22, 2016, Lippert sawBridget Faricy Beredo, FNP, for refills and reported having anxiety almost every day. (*Id.* at 1754-55.) Lippert took hydroxyzine almost daily and the medicine worked well to relieve his anxiety. (*Id.* at 1754.) Lippert told Beredo he had never taken an antidepressant. (*Id.*) On examination, Beredo found Lippert alert, cooperative, and not anxious or depressed. (*Id.*)

On November 3, 2017, Lippert saw Penny Mullins, M.D., and reported he was "[d]oing ok" with his anxiety medication and did not feel the need to change. (*Id.* at 1732.) Lippert told Dr. Mullins he had "[o]ccasional panic sx situational with problem with well, etc." (*Id.*) Lippert denied feeling depressed. (*Id.*) On examination, Dr. Mullins found Lippert alert, anxious, and fully oriented. (*Id.* at 1733.) Dr. Mullins noted Lippert was "[m]ildly anxious talking about sx, meeting new Dr." (*Id.*)

On January 15, 2018, Lippert saw Dr. Mullins for follow up and reported "[p]ersistent anxiety sx, worries frequently about bills, etc." (*Id.* at 1729. 1731.) Dr. Mullins noted Lippert took hydroxyzine as needed and although he was not on a daily anxiety medication, he would be interested in trying one. (*Id.* at 1729.) Lippert denied any depression or suicidal ideation. (*Id.*) Lippert's anxiety made his IBS worse. (*Id.*) Dr. Mullins started Lippert on Prozac. (*Id.* at 1730.) Dr. Mullins noted Lippert's anxiety was not well controlled. (*Id.*)

On March 7, 2018, Lippert saw Dr. Mullins for follow up regarding his anxiety and reported continuing anxiety and worrying a lot, especially when trying to sleep. (*Id.* at 1726.) He told Dr. Mullins he had received a notice to move because the building he was living in was going to be demolished. (*Id.*) Lippert denied depression and did not feel he needed or wanted to see a counselor. (*Id.*) Lippert endorsed "[v]ery occasional panic sx." (*Id.*) Dr. Mullins noted Lippert took Prozac and that Lippert wondered if

5

the timing of his Prozac was contributing to his sleep issues. (*Id.*) Dr. Mullins told Lippert he could try taking Prozac in the morning and could increase it as discussed. (*Id.* at 1727.) Dr. Mullins noted Lippert declined a counseling referral. (*Id.*)

On November 19, 2019, Lippert saw Shannon McInchak, LMSW, for an initial behavioral health intake assessment. (*Id.* at 1884.) Lippert reported worsening anxiety since his mother died seven years ago. (*Id.*) He also endorsed panic attacks and difficulty going to public places. (*Id.*) He avoided public transportation or shopping in stores, relying on his wife to take care of these things. (*Id.*) Lippert's wife reported she had seen Lippert "pace, cry and cover his ears when he feels anxious." (*Id.*) Lippert told McInchak that he struggled with memory issues and his ability to focus. (*Id.*) He stated he recently forgot the names of his tools when he was working in his garage, and his wife stated that Lippert forgot his social security number, birth dates, and anniversaries. (*Id.*) Lippert reported he was currently taking Paxil and was allergic to Zoloft. (*Id.*) On examination, McInchak found Lippert alert and fully oriented, with intact judgment and insight, normal speech, and normal and appropriate affect. (*Id.* at 1885.) McInchak diagnosed Lippert with delayed post-traumatic stress disorder. (*Id.*) McInchak directed Lippert to follow up with her in three weeks, and noted Lippert would be referred to another provider for "ongoing evaluation and medication management." (*Id.* at 1886.) McInchak also recommended neuropsychological testing for evaluation of Lippert's memory concerns. (*Id.*)

On January 3, 2020, Lippert saw McInchak for counseling and reported he did not leave his house often or go outside because of an "ongoing conflict with his neighbor and landlord." (*Id.* at 1879.) Lippert relied on his wife to do any activities outside the house. (*Id.*) He used to walk to help with his anxiety and he relied on his animals to calm him down when he felt anxious and overwhelmed. (*Id.*) On examination, McInchak found full orientation, an anxious, hypersensitive, and restless mood, compulsive behavioral control, appropriate appearance, normal thought process, normal memory, fair judgment, intact

insight, forgetful attention, and normal facial expressions. (*Id.* at 1881.) McInchak further found a good response to treatment. (*Id.*)

On February 19, 2020, Lippert saw Charmin Kuhn, PA, for medication management and reported he had seen a Social Security psychologist who, per Lippert, had told Lippert he could not work or he would have a breakdown. (*Id.* at 1876-77.) Lippert also asked Kuhn for a letter stating that Lippert needed an emotional support animal for his PTSD, anxiety, and depression. (*Id.* at 1877.) Lippert endorsed frequent flashbacks, anxiety, depression, fatigue, and insomnia. (*Id.*) On examination, Kuhn found Lippert pleasant, in no acute distress, and withdrawn. (*Id.* at 1878.) Lippert's diagnoses included PTSD, major depressive disorder, recurrent, moderate, unspecified anxiety disorder, and psychophysiological insomnia. (*Id.* at 1876.) Kuhn adjusted Lippert's medications. (*Id.*)

On February 24, 2020, Lippert saw McInchak for counseling and reported struggling with being in public places when they were crowded. (*Id.* at 1872.) Lippert asked for a letter for an emotional support animal, as he felt that bringing his cat with him on the bus and other places would help him feel less overwhelmed. (*Id.*) Lippert felt he was incapable of working because of his anxiety and difficulty with conflict. (*Id.*) On examination, McInchak found full orientation, an anxious, restless, and fearful mood, appropriate appearance, normal thought process, normal memory, fair judgment, intact insight, forgetful attention, and normal facial expression. (*Id.* at 1874.) Lippert's diagnoses consisted of PTSD and major depressive disorder, recurrent, moderate. (*Id.* at 1872.)

On February 24, 2020, McInchak wrote a letter stating that Lippert received treatment for PTSD and that Lippert "has voiced that the presence of his cat provides emotional support and companionship that functionally helps him on a daily basis." (*Id.* at 2003.)

In an undated letter, PA Kuhn wrote a letter stating that "Due to his PTSD, anxiety and depression; Brian Lippert needs an emotional support animal." (*Id.* at 2004.)

7

On July 29, 2020, Lippert saw Sandhya Jain, AGPCNP, for medication management and reported that he wanted to try a higher dose of hydroxyzine for his anxiety, PTSD, and sleeping problems. (*Id.* at 1870.) Lippert's diagnoses consisted of insomnia, unspecified anxiety disorder, and PTSD. (*Id.*)

On August 24, 2020, Lippert saw PA Kuhn for follow up and reported increased anxiety and that his medications were not helping as much as they did before. (*Id.* at 1867-68.) Lippert told Kuhn he had a hard time on July 4th because the fireworks triggered his anxiety and that he had been experiencing flashbacks. (*Id.* at 1868.) Kuhn continued Lippert's medications. (*Id.*) Lippert's diagnoses included PTSD, unspecified anxiety disorder, major depressive disorder, recurrent, moderate, and insomnia. (*Id.* at 1867.)

On December 1, 2021, Lippert saw Michelle Deaton, APRN-CNP, to establish care and reported he had been off Prozac for three months. (*Id.* at 1944, 1946.) On examination, Deaton found Lippert fully oriented with normal mood and behavior. (*Id.* at 1946.) Deaton prescribed Trazadone for psychophysiological insomnia and Prozac for anxiety. (*Id.* at 1946-47.)

On March 11, 2022, Lippert saw Chelsey Hamms, LISW-S, for a behavioral health assessment and reported anxiety and depression. (*Id.* at 1937.) Lippert endorsed depressed mood, decreased appetite, decreased sleep, fatigue/lack of energy, lack of motivation, feelings of worthlessness, anger/irritability, nervousness, anxiety, or on edge, nightmares or flashbacks, being constantly on guard, watchfulness, easily startled, and feeling numb or detached. (*Id.*) Lippert reported taking Prozac and Trazadone. (*Id.* at 1938.) On examination, Hamms found depressed mood and affect, good hygiene, appropriate dress, normal behavior, cooperative attitude, good eye contact, normal speech, intact and goal-oriented thought processes, moderate cognitive distortions, intact associations, full orientation, and fair insight and judgment. (*Id.* at 1937-38.)

8

Hamms found similar findings on examination on April 8 and 22, May 6 and 27, June 10, July 8 and 22, August 5 and 19, and September 2 and 16, 2022.  (*Id.* at 1969-74, 1976-78, 2089-90, 2092-94, 2098-2103, 2105-08.)

On September 16, 2022, Lippert asked Hamms to write a letter supporting his request for his cat to be considered an emotional support animal to help his disability case and when he might move out.  (*Id.* at 2090.)  Hamms stated she would write the letter.  (*Id.*)

That same day, Hamms wrote a letter stating as follows:

> Brian is a therapy patient of mine at Mercy Health. [I] am very familiar with Brian [sic] treatment history and with the functional limitations imposed by Brian [sic] health conditions.
>
> Due to having this health condition that meets the definition of a disability under the Fair Housing Act, Brian experiences impairment in functioning. To help alleviate this impairment, I have recommended that Brian have an Emotional Support Animal (ESA). This ESA is necessary for Brian because it reduces distress and impairment associated with Brian [sic] disability by providing companionship and assistance with a consistent daily routine.

(*Id.* at 2005.)

On September 30, 2022, Lippert saw Hamms for follow up and reported being unable to complete a lot of the tasks he was asked to perform during his disability appointment.  (*Id.* at 2086.)  On examination, Hamms found anxious mood and affect, fair hygiene, appropriate dress, normal behavior, cooperative attitude, good eye contact, normal speech, tangential thought processes, moderate cognitive distortions, intact associations, full orientation, and fair insight and judgment.  (*Id.* at 2087.)

On October 14, 2022, Lippert saw Hamms for follow up and reported his disability claim had been denied again.  (*Id.* at 2084-85.)  On examination, Hamms found depressed mood and sad affect, good hygiene, appropriate dress, normal behavior, cooperative attitude, good eye contact, normal speech, intact and goal-oriented thought processes, moderate cognitive distortions, intact associations, full orientation, and fair insight and judgment.  (*Id.* at 2085.)

On November 4, 2022, Lippert saw Hamms for follow up.  (*Id.* at 2081.)  On examination, Hamms found depressed mood, fair hygiene, normal behavior, cooperative attitude, normal speech, intact and goal-oriented thought processes, moderate cognitive distortions, intact associations, full orientation, and fair insight and judgment.  (*Id.* at 2082.)

On November 18, 2022, Lippert saw Hamms for follow up and reported he had used a transportation company to attend an eye doctor appointment and that it had gone well.  (*Id.* at 2076-77.) On examination, Hamms found anxious mood and affect, fair hygiene, appropriate dress, normal behavior, cooperative attitude, good eye contact, normal speech, intact and goal-oriented thought processes, moderate cognitive distortions, intact associations, full orientation, and fair insight and judgment.  (*Id.* at 2077.)

Hamms found similar findings on examination on December 9 and 30, 2022, January 13 and 27, February 10 and 24, March 17 and 31, and April 28, 2023.  (*Id.* at 2070-71, 2268-69, 2279-80, 2290-91, 2300-01, 2311-12, 2322-23, 2333-34, 2344-45.)

On May 4, 2023, Lippert saw Ashley Kent, APRN-CNP, to establish care.  (*Id.* at 2248.)  Lippert reported that his main concern was breakthrough anxiety from his PTSD.  (*Id.*)  Lippert told Kent he managed his PTSD with counseling, and Kent noted Lippert was taking fluoxetine for his PTSD.  (*Id.*) Lippert and Kent discussed taking Prazosin for sleep disturbance and trialing hydroxyzine for breakthrough anxiety.  (*Id.* at 2248-49.)  On examination, Kent found Lippert nervous/anxious with normal behavior.  (*Id.* at 2251-52.)  Kent prescribed hydroxyzine and trazodone.  (*Id.* at 2252.)

## C.  State Agency Reports

On May 9, 2022, David Dietz, Ph.D., reviewed the file and opined that there was insufficient evidence in the file to determine the severity of Lippert's mental health impairments before the August 2016 consultative psychological evaluation.  (*Id.* at 69, 84.)  Dr. Dietz further opined Lippert had a mild

10

limitation in his ability to understand, remember, or apply information and moderate limitations in his ability to interact with others, concentrate, persist, or maintain pace, and adapt or manage himself.  (*Id.*) Dr. Dietz opined that Lippert could "concentrate and persist for moderately complex tasks (3 to 4 steps) without demands of fast pace or high production quotas," interact superficially with others, and "adapt and manage himself in a predictable work setting where major changes are explained and he is given time to adjust to new expectations."  (*Id.* at 73-74, 88-89.)

On February 15, 2023, on reconsideration, Jennifer Swain affirmed Dr. Dietz's findings.  (*Id.* at 95, 99-100, 107-08, 111-13.)

## D.    Hearing Testimony

During the July 28, 2023 hearing, Lippert testified to the following:

- He lives in an apartment with his wife and daughter.  (*Id.* at 46.)  He holds a driver's license but has not driven in three years.  (*Id.* at 47.)  He gets distracted and does not pay attention when he drives.  (*Id.* at 56.)  He relies on family to take him places.  (*Id.* at 47.)  He tries not to use public transportation because they live in a bad part of town.  (*Id.* at 48.)

- When his mental health issues first began, he went to the emergency room frequently because he didn't understand what was happening.  (*Id.* at 49.)  His counselor diagnosed him with "severe PTSD."  (*Id.* at 50.)  He shakes to the point where he cannot hold anything and cuts himself off from people.  (*Id.*)  He had seen his counselor earlier that day.  (*Id.*)  He finds talk therapy helpful.  (*Id.*)  He takes two medications for his mental health impairments that are prescribed by his primary care provider, and he finds that they help "[g]reatly."  (*Id.* at 51.)  He has an emotional support animal that is always around him.  (*Id.*)

- He has trouble sleeping.  (*Id.* at 52.)  He takes sleeping pills, but they don't always work.  (*Id.*)  He has nightmares when he sleeps.  (*Id.*)  He lacks energy during the day. (*Id.*)  He would rather be in bed than deal with anything.  (*Id.*)  He has mood swings. (*Id.* at 53.)  He has issues with anger.  (*Id.*)  He tries to keep his calm.  (*Id.*)

- He does not belong to any organizations or clubs because he chooses to stay away from people.  (*Id.* at 54.)  He plays video games and watches TV.  (*Id.*)  Playing video games helps keep his mind focused on something.  (*Id.* at 55.)  He can care for himself.  (*Id.*)

The VE testified Lippert had past work as a sales attendant and security guard.  (*Id.* at 58.)  The ALJ then posed the following hypothetical question:

> [F]or the first hypothetical, I would like you to assume a hypothetical individual of Mr. Lippert's age, education, and with the past jobs you just described.  Further assume this hypothetical individual can perform work at the light exertional level, can occasionally climb stairs or ramps, stoop, kneel, crouch, or crawl.
>
> Can never climb ladders, ropes, scaffolds, or balance, as that term is used vocationally.  Occasional exposure to extreme heat, must avoid all exposure to dangerous moving machinery and unprotected heights, work with a moderate level of noise, with work that can be learned in 30 days or less, with simple routine tasks, simple work-related decisions, and routine workplace changes.
>
> Is able to remain on task, persist, and maintain pace in two-hour increments, with no production rate pace work, such as on an assembly line.  Occasional interaction with co-workers, no tandem tasks, occasional interaction with supervisors, and the general public.
>
> Can such a hypothetical individual perform either of the claimant's past work?

(*Id.* at 58-59.)

The VE testified the hypothetical individual would not be able to perform Lippert's past work as a sales attendant and security guard.  (*Id.* at 59.)  The VE further testified the hypothetical individual would be able to perform other representative jobs in the economy, such as retail marker, routing clerk, and shipping and receiving weigher.  (*Id.*)

Lippert's attorney asked the VE whether the need for an emotional support animal, specifically a cat, would affect the available jobs.  (*Id.* at 62.)  The VE testified that an emotional support animal would be an accommodation.  (*Id.*)

### III.  STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to

12

"result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315, 404.1505(a).

A claimant is entitled to a POD only if the claimant: (1) had a disability; (2) was insured when the claimant became disabled; and (3) filed while the claimant was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

A disabled claimant may also be entitled to receive SSI benefits. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981). To receive SSI benefits, a claimant must meet certain income and resource limitations. 20 C.F.R. §§ 416.1100, 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4)*, 416.920(a)(4). *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that they are not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b), 416.920(b). Second, the claimant must show that they suffer from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c), 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education, or work experience. *See* 20 C.F.R. §§ 404.1520(d), 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent the claimant from doing their past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f), 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent the claimant from doing their past relevant work, if other work exists in the

13

national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g).

Here, Lippert was insured on the alleged disability onset date, August 22, 2012, and remained insured through December 31, 2017, the date last insured ("DLI").  (Tr. 16-17.) Therefore, in order to be entitled to POD and DIB, Lippert must establish a continuous twelve-month period of disability commencing between these dates.  Any discontinuity in the twelve-month period precludes an entitlement to benefits.  *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV.   SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2017.

2. The claimant has not engaged in substantial gainful activity since August 22, 2012, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3. The claimant has the following severe impairments: osteoarthritis of the sacroiliac (SI) joints, and hips; degenerative disc disease of the lumbar spine; obesity; depression; anxiety; and post-traumatic stress disorder (PTSD) (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except: he can occasionally climb stairs or ramps, stoop, kneel, crouch, or crawl; can never climb ladders, ropes, and scaffolds, or balance, as that term is used vocationally. Occasional exposure to extreme heat. Must avoid all exposure to dangerous moving machinery and unprotected heights. Work with a moderate level of noise. With work that can be learned in 30 days, or less, with simple routine tasks, with simple work-related decisions, and routine work-place changes. Is able to remain on task, persist, and maintain pace in two-hour increments, with no production rate pace work, such as on an assembly line.

14

Occasional interaction with coworkers, no tandem tasks, occasional interaction with supervisors and the general public.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on March **, 1971, and was 41 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. The claimant subsequently changed age category to closely approaching advanced age (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11. The claimant has not been under a disability, as defined in the Social Security Act, from August 22, 2012, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 18-30.)

## V. STANDARD OF REVIEW

The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y*

15

*of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached."). This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D.

Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-1300, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-cv-734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10-CV-017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

In his two assignments of error, Lippert challenges the ALJ's evaluation of the medical opinion evidence in the record.  In his first assignment of error, Lippert asserts that the "ALJ failed to adequately evaluate the supportability of the Prior Administrative Medical Findings and to adequately develop the record concerning the functional impact of Plaintiff's anxiety."[3]  (Doc. No. 8 at 1.)  In his second assignment of error, Lippert argues that the "ALJ failed to adequately evaluate the opinion evidence concerning Plaintiff's need for an emotional support animal, leaving the ALJ's resultant decision without the support of substantial evidence."  (*Id.*)

### A.    State Agency Reviewing Opinions

Lippert argues that the state agency reviewing psychologists "did not acknowledge the aspects of the clinical notes beyond mental status examinations."  (Doc. No. 8 at 12-13.)  Lippert asserts that the state agency reviewing psychologists "cited to exactly two notes": the 2016 consultative psychological examination and the March 2022 note from Hamms.  (*Id.* at 13.)  Lippert maintains that "[n]either of these notes, nor the PAMFs discussions thereof, provide a sufficient basis for informing reviewers of the record

---

[3] The Commissioner argues that Lippert's argument regarding the ALJ's failure to develop the record "is wholly underdeveloped and therefore waived."  (Doc. No. 10 at 9.)  In his reply brief, Lippert argues that he "intends [it] to be a mere demonstration of harm from the error of the actual argument—*i.e.*, the ALJ did not address supportability; this lack of supportability analysis resulted in inadequate consideration of the PAMFs; on remand, it is reasonable to believe that adequate consideration of the PAMFs may result in a finding that solicitation of new evidence is warranted."  (Doc. No. 11 at 4.)

as to the functional impact of Plaintiff's conditions." (*Id.*)  Therefore, "reviewers of this case, including the ALJ, are left to guess at how the longitudinal interview evidence affects Plaintiff's RFC." (*Id.* at 14.) Lippert also argues that the ALJ's discussion of the state agency reviewing psychologists "does not account for supportability" and fails to mention the evidence the state agency reviewing psychologists discussed or evaluated, nor the reasoning the state agency reviewing psychologists relied on in support of their findings. (*Id.*)  For all these reasons, Lippert asserts that remand is required. (*Id.* at 15.)

The Commissioner responds that the ALJ "reasonably evaluated the findings of the state agency reviewing psychologists." (Doc. No. 10 at 6.)  The Commissioner argues that, in weighing and analyzing the state agency reviewing psychologists' opinions, the ALJ explained that the "overall evidence was supported by and consistent with no more than moderate functional limitations related to Plaintiff's mental impairments." (*Id.*)  The Commissioner asserts that Lippert "fails to suggest what additional limitations the ALJ should have adopted." (*Id.* at 7.)  In addition, the Commissioner maintains that the ALJ "set forth a *more restrictive* RFC than suggested by the state agency reviewers in part . . . and only failing to adopt a restriction to superficial interaction (and instead limiting Plaintiff to occasional interaction) which he both explained based on the evidence cited above, and which Plaintiff failed to argue was error." (*Id.*) (emphasis in original). Moreover, the Commissioner argues that the record shows that the state agency reviewing psychologists reviewed mental health records from 2016 through 2022 even if they did not cite all of them, and while Dr. Swain only cited two examinations in the record, Dr. Deitz cited to at least seven of them. (*Id.* at 8.)  Regardless, the Commissioner maintains, the regulations only require "*the ALJ* to explain how they considered the evidence pursuant to the cited regulation; not the state agency reviewers." (*Id.*) (emphasis in original).  The Commissioner argues that substantial evidence supports the ALJ's explanation of how the evidence supported the state agency reviewing psychologists' opinions and Lippert's arguments to the contrary "are unavailing." (*Id.* at 8-9.)

18

In his reply, Lippert argues that "[t]he pertinent concern is the evidence that opining sources cite in explaining their opinion and the remainder of the explanations from the opining sources."  (Doc. No. 11 at 4.)

Since Lippert's claim was filed after March 27, 2017, the Social Security Administration's new regulations ("Revised Regulations") for evaluation of medical opinion evidence apply to this claim. *See Revisions to Rules Regarding the Evaluation of Medical Evidence (Revisions to Rules)*, 2017 WL 168819, 82 Fed. Reg. 5844 (Jan. 18, 2017); 20 C.F.R. §§ 404.1520c, 416.920c.

Under the Revised Regulations, the Commissioner will not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical findings, including those from your medical sources."  20 C.F.R. § 416.920c(a).  Rather, the Commissioner shall "evaluate the persuasiveness" of all medical opinions and prior administrative medical findings using the factors set forth in the regulations: (1) supportability;[4] (2) consistency;[5] (3) relationship with the claimant, including length of the treatment relationship, frequency of examinations, purpose of the treatment relationship, extent of the treatment relationship, and examining relationship; (4) specialization; and (5) other factors, including but not limited to evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of the agency's disability program's policies and evidentiary requirements.   20 C.F.R.  §§  404.1520c(a),  (c)(1)-(5),  416.920c(a),  (c)(1)-(5).   However, supportability and consistency are the most important factors.   20 C.F.R.  §§  404.1520c(b)(2), 416.920c(b)(2).

---

[4] The Revised Regulations explain the "supportability" factor as follows: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1).

[5] The Revised Regulations explain the "consistency" factor as follows: "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2).

The Revised Regulations also changed the articulation required by ALJs in their consideration of medical opinions. The new articulation requirements are as follows:

> (1) Source-level articulation. Because many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for us to articulate in each determination or decision how we considered all of the factors for all of the medical opinions and prior administrative medical findings in your case record. Instead, when a medical source provides multiple medical opinion(s) or prior administrative medical finding(s), we will articulate how we considered the medical opinions or prior administrative medical findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate. We are not required to articulate how we considered each medical opinion or prior administrative medical finding from one medical source individually.

> (2) Most important factors. The factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be. Therefore, we will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision. We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record.

> (3) Equally persuasive medical opinions or prior administrative medical findings about the same issue. When we find that two or more medical opinions or prior administrative medical findings about the same issue are both equally well-supported (paragraph (c)(1) of this section) and consistent with the record (paragraph (c)(2) of this section) but are not exactly the same, we will articulate how we considered the other most persuasive factors in paragraphs (c)(3) through (c)(5) of this section for those medical opinions or prior administrative medical findings in your determination or decision.

20 C.F.R. §§ 404.1520c(b)(1)-(3), 416.920c(b)(1)-(3).

"Although the regulations eliminate the 'physician hierarchy,' deference to specific medical opinions, and assigning 'weight' to a medical opinion, the ALJ must still 'articulate how [he/she] considered the medical opinions' and 'how persuasive [he/she] find[s] all of the medical opinions.'" *Ryan L.F. v. Comm'r of Soc. Sec.,* No. 6:18-cv-01958-BR, 2019 WL 6468560, at *4 (D. Ore. Dec. 2, 2019)

(quoting 20 C.F.R. § 416.920c(a), (b)(1)).  A reviewing court "evaluates whether the ALJ properly considered the factors as set forth in the regulations to determine the persuasiveness of a medical opinion." *Id.*

As the Commissioner points out, the transcript reveals that the state agency reviewing physicians reviewed the entire file before them, even if they did not cite all of the evidence specifically.  (Tr. 65-68, 73-74, 80-84, 88-89, 93-95, 105-08.)

Furthermore, the ALJ reviewed the entire record evidence, including the evidence post-dating the state agency reviewers' opinions.  At Step Two, the ALJ found as follows regarding Lippert's mental impairments:

> The severity of the claimant's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.04, 12.06, and 12.15. In making this finding, the undersigned has considered whether the "paragraph B" criteria are satisfied. To satisfy the "paragraph B" criteria, the mental impairments must result in one extreme limitation or two marked limitations in a broad area of functioning. An extreme limitation is the inability to function independently, appropriately, or effectively, and on a sustained basis. A marked limitation is a seriously limited ability to function independently, appropriately, or effectively, and on a sustained basis.
>
> The claimant testified the most recent time he went to the emergency department for mental health issues was two years prior to the August 2012 alleged onset date. Specifically he went in 2010, however he was not admitted at that time. He said he still has daily significant bouts of PTSD symptoms, has trouble sleeping/nightmares, and has anger issues, although there is little mention of nightmares in the treatment record, (20F/55, 57). He also reported difficulties concentrating and focusing, and stated he is easily angered, again there is little mention of anger problems in the record, (20F/55, 57). He testified to having started talk therapy with a counselor in Swanton, Ohio, for the last 18 months, and acknowledged it is helpful. He is prescribed medications for mental health by his primary care provider, reporting they are helpful and without adverse side effects, (hearing testimony).
>
> In understanding, remembering, or applying information, the claimant has a moderate limitation. The claimant graduated from high school and received a certification in law enforcement (Hearing Transcript). He manages his own medication and appointments but does use a pillbox and calendar to remind him (6F/3). He has a valid driver's license (6F/3), although he testified he has not driven since 2020. At the psychological consultative examination in 2016

his memory was described as intact for his age (6F/4), despite the claimant's allegations at a later physical consultative examination of memory issues, (18F/1). Just prior to the hearing in May 2023, there was a notation of memory loss due to an unspecified medical condition, (21F/13), but his treating source described him on exam as oriented, alert, with normal behavior, and with his mental status at baseline, at that same visit, (31F/16), and there was no diagnosis made regarding his memory. Mental status exams by his treating mental health providers stated he had both intact cognitive processes and moderate cognitive distortions, but it did not list what the distortions were (15F/6-7; 16F/7, 11, 14; 20F/6, 12, 17, 20, 22, 28, 34-37, 40-42; 21F/33, 44, 55, 65, 76, 87, 97, 109). There is no evidence to support a finding the claimant has marked, or extreme, limits in this criterion.

In interacting with others, the claimant has a moderate limitation. The claimant said he did not like being in crowded stores because that is a trigger for anxiety (6F/3). The consultative examiners described the claimant has polite, friendly, and cooperative (6F/4; 18F/2). Mental status exams by his treating mental health providers stated his behavior was within normal limits as he was cooperative (15F/6-7; 16F/7, 11, 14; 20F/6, 12, 17, 20, 22, 28, 34-37, 40-42; 21F/33, 44, 55, 65, 76, 87, 97, 109). There is no evidence to support a finding he has marked, or extreme, limits in this criterion.

With regard to concentrating, persisting, or maintaining pace, the claimant has a moderate limitation. The claimant stated he has difficulty concentrating and focusing (Hearing Transcript). He testified he plays games on a Play Station to help keep his mind focused on something (6F/3; Hearing Transcript). He likes to read (6F/3). At that same 2016 psychological consultative examination, it was noted the claimant had no difficulty maintaining attention and concentration to topics (6F/6). Mental status exams by his treating mental health providers stated his thought processes were intact (15F/6-7; 16F/7, 11, 14; 20F/6, 12, 17, 20, 22, 28, 34-37, 40-42; 21F/33, 44, 55, 65, 76, 87, 97, 109). Although the claimant reported decreased concentration on one occasion, (20F/63), his treating source noted no focal deficit, described him as alert, oriented, with a normal mood and behavior, (20F/54). There is no evidence to support a finding the claimant has marked, or extreme, limits in this criterion.

As for adapting or managing oneself, the claimant has experienced a moderate limitation. The claimant stated he can do personal care, stating he only need help putting on his shoes (6F/3; Hearing Transcript). He can do some light household chores as long as he goes slow due to allegations of pain (6F/3; Hearing Transcript). He can make something simple to eat (6F/3). The consultative examiner in 2016 said the claimant had sufficient judgment and insight (6F/5). Mental status exams by his treating mental health providers stated he had fair judgment and insight (15F/6-7; 16F/7, 11, 14; 20F/6, 12, 17, 20, 22, 28, 34-37, 40-42; 21F/33, 44, 55, 65, 76, 87, 97, 109). However, there

is no evidence to support a finding the claimant has marked, or extreme, limits in this criterion.

(Tr. 20-22.)

In the RFC analysis, the ALJ found as follows:

Regarding mental health, the claimant was provided prescriptions for hydroxyzine beginning in July 2015 for anxiety, and fluoxetine was added in January 2018 by a primary care provider (12F/121-157, 160-218). Those medications were continued by this provider until December 2018 but with very little or no updates regarding symptoms. Examinations consistently stated the claimant was alert, cooperative, not depressed, and either not anxious or mildly anxious (Id.).

In January 2019, the claimant established primary care treatment (13F/23). Physical examination was normal, and he was provided prescriptions for Prozac and for non-severe impairments such as hypertension and GERD (13F/24-26). He did not return for ten months, until November 2019, reporting increased anxiety and increased PTSD symptoms (13F/20). He was referred for medication management and psychotherapy (13F/22). The claimant appeared for therapy sessions in January 2020 and a medication management follow up in February 2020 where some adjustments were made to his mental health medication (13F/12-15). Then next record of treatment was a return for medication refills in July 2020 followed by another return the next month where he reported increased anxiety when he said his medications were not working as much as they previously did (13F/3-6). The claimant did not return to this provider until almost a year later, in July 2021, now stating he needed to 'get back on' his medication (13F/1-2).

The claimant again established primary care treatment in December 2021 (15F/13). Physical exam was normal as well as mood, affect, and behavior (15F/14-15). It was noted he had been out of Prozac and trazodone for three months, so these were prescribed (15F/16). (This note he was out of medication for three months was repeated in all subsequent treatment notes through the most recent visit in May 2023) (21F/17).

The claimant received individual therapy about every two weeks to address his reports of anxiety and trauma, beginning in March 2022 (15F-16F; 20F). He listed external stressors such as shootings where he lived and spousal abuse which he said were both triggers, as well as financial issues, various people living in the home, and fear of eviction (16F; 20F/5-46). He complained, in in May 2022, his wife was preventing him from sleeping with loud noises (16F/7).

At an October 2022 session, the therapist brought up looking for part-time work but said the claimant would change the subject back to past frustrations

or the unfairness of his life (20F/20). They worked on barriers such as learned helplessness and fear of the unknown (Id.). Several times in 2023, his therapist discussed options for work-from-home opportunities for the claimant to earn money so he could move out on his own since his home life was a big stressor and trigger for him (21F/86-87, 97). The sessions were conducted by telehealth, so examinations were limited, but he was found to be alert and oriented with appropriate to fair hygiene, mood was either sad with sad affect or anxious with anxious affect, he had intact cognitive processes, insight and judgment were fair, he denied suicidal and homicidal ideations, behavior was within normal limits as he was cooperative, and his thought processes were intact, but he had moderate cognitive distortions (15F/6-7; 16F/7, 11, 14; 20F/6, 12, 17, 20, 22, 28, 34-37, 40-42; 21F/33, 44, 55, 65, 76, 87, 97, 109).

For the period from 2022 to May 2023, it appeared the claimant received refills of medication for mental health, and non-severe impairments, mostly by telephone visits where no remarks were taken regarding symptoms, concerns, effectiveness, or any recommendations for treatment other than the medication he was taking (20F-21F). In April 2022, the claimant followed up with his primary care nurse practitioner, in person, for refill of ibuprofen he took for back pain (16F/12). At that visit, his anxiety and PTSD were considered to be stable on Prozac and trazodone, but he again reported his home life was very stressful which he said exacerbated his back pain (Id.).

However, examination found normal range of motion and normal gait (16F/13). His mood and affect were normal (Id.). Ibuprofen 800 was refilled (16F/12). At a November 2022 telephone encounter for medication refills, the nurse practitioner stated this would be the last time he was given refills, until he was seen in the office as he received his medication refills by telephone for most of the year (Id.).

(*Id.* at 24-25.)

As set forth above, the Revised Regulations changed the articulation required by *ALJs* in their consideration of medical opinions, with supportability and consistency being the most important factors. In weighing and analyzing the state agency reviewing psychologists' opinions, the ALJ found as follows:

State agency psychological consultant, David Dietz, Ph.D., opined for the initial review the claimant could concentrate and persist for moderately complex tasks (three- to four-steps) without demands of fast pace or high production quotas; adapt and manage in a predictable work setting where major changes are explained and he is given time to adjust to new expectations; and where he can interact superficially with others, while not defining superficial, (1A; 4A). However, in the more detailed areas of their opinion, there were only moderate limits noted in the ability to work in coordination with or in proximity to others, not marked or extreme limits.

Only moderate limits in the ability to interact with the general public, or accept instructions and respond appropriately to criticism from supervisors, not marked or extreme limits. And, finally, only moderate limits in the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, not marked or extreme limits. Thus, while they did not explain the term superficial, in looking at the totality of their evaluation, they did not find any marked or extreme limits in social functioning, rather they only noted moderate limits in this criterion. Jennifer Swain, Psy.D. adopted the initial assessment upon reconsideration since it remained supported by that evidence (5A; 8A).

These opinions were somewhat persuasive since the overall evidence supports no more than moderate functional limitations related to psychological impairments. This is also supported by conservative treatment for mental health by his primary care provider consisting of medication and later with individual therapy for which mental status exams were relatively unremarkable (12F-13F; 15F-16F; 20F-21F). However, due to reports in the evidence that loud noise was a trigger for increased symptoms, the undersigned limited him to work with a moderate level of noise in the residual functional capacity assessment herein (2E; 16F; 20F/5-46). The undersigned does not focus on just one word, here the word 'superficial', for the reasons explained above, rather the focus is the entirety of the opinion, when compared to the remainder of the medical evidence of record. There are no notations to support a finding, nor did the State agency consultants find any, of marked or extreme limits in any specific area of social functioning, rather only moderate limits. As a result, the undersigned limited the claimant to occasional interaction with coworkers, with no tandem tasks, occasional interaction with supervisors and the general public. Additionally, the claimant was further limited to work that can be learned in 30 days, or less, with simple, routine tasks, simple work related decisions, and routine work place changes, with the ability to remain on task, persist, and maintain pace in two-hour increments, but with no production rate pace work, such as on an assembly line, to reduce any triggers for mental health issues the claimant mentioned, (12F-13F; 15F-16F; 20F-21F; Hearing Transcript).

(*Id.* at 26-27.)

In reading the opinion as a whole, the ALJ considered the supportability (and consistency) of the state agency reviewing psychologists' opinions as required by the regulations, discussing evidence that was unsupportive of disability in the process. (*Id.* at 20-28.) "[A]n ALJ need not specifically use the terms 'supportability' or 'consistency' in [the] analysis." *Adams v. Comm'r of Social Sec.*, Case No. 1:21-CV-02199-PAB, 2023 WL 2373541, at *6 (N.D. Ohio Jan. 23, 2023) (citing *Hardy v. Comm'r of Soc.*

*Sec.*, 2021 WL 4059310, at *2 (S.D. Ohio Sept. 7, 2021); *Terry Q. v. Comm'r of Soc. Sec.*, 2022 WL 969560, at *5 (S.D. Ohio March 31, 2022); *Fowler v. Comm'r of Soc. Sec.*, 2022 WL 3648436, at *9 (N.D. Ohio Aug. 9, 2022), *report and recommendation adopted by* 2022 WL 3647771 (N.D. Ohio Aug. 24, 2022)), *report and recommendation adopted by Adams v. Kijakazi*, 2023 WL 2347368 (N.D. Ohio Mar. 3, 2023).

There is no error.

**B.      Opinion Evidence Regarding Emotional Support Animal**

In his second assignment of error, Lippert argues that the ALJ found that the letters from his therapist opining that Lippert needed an emotional support animal were "'not functional analyses related to the claimant's ability to work, as his mental status exams were relatively unremarkable.'" (Doc. No. 8 at 16-17.) Lippert asserts that "[t]his appears to be a twofold assertion: the ALJ appears to allege that the letters are not in fact opinions, and the ALJ appears to allege that the letters were meaningfully inconsistent with unspecified mental status exam findings." (*Id.* at 17.) Lippert maintains that to the extent the ALJ found the letters to not be opinions, the ALJ was incorrect. (*Id.*) Nor does the ALJ "explain how the need for an emotional support animal is inconsistent with the mental status examinations of record." (*Id.*) Lippert argues that the ALJ failed to provide a sufficient explanation as to how the ALJ came to his conclusions. (*Id.* at 18.) Lippert asserts that this is harmful error, as the VE testified that the need for an emotional support animal would be an accommodation and would preclude all work. (*Id.*)

The Commissioner responds that the ALJ "reasonably considered" whether Lippert required an emotional support animal. (Doc. No. 10 at 10.) The Commissioner argues the ALJ properly found these letters were not medical opinions under the regulations, as these letters do not discuss what Lippert can do despite his symptoms or diagnoses in a work setting. (*Id.* at 10-11.) In addition, the Commissioner asserts that Lippert fails to "cite to any authority establishing a standard for incorporating a claimant's need for an

emotional support animal into an RFC assessment." (*Id.* at 11.)  The Commissioner maintains that "courts within the Sixth Circuit and elsewhere have examined whether emotional support animals and service animals are 'medically necessary' under similar circumstances and have found that they are not." (*Id.* at 11-12) (citations omitted).  Therefore, the ALJ did not err in excluding the need for an emotional support animal from the RFC.  (*Id.* at 12.)

Lippert's reply focuses on rebutting the Commissioner's arguments that these letters are not medical opinions.  (Doc. No. 11 at 4-5.)  Lippert fails to respond to the Commissioner's argument that "courts within the Sixth Circuit and elsewhere have examined whether emotional support animals and service animals are 'medically necessary' under similar circumstances and have found that they are not." (*Id.*)

In weighing and analyzing the letters from Lippert's therapists regarding his need for an emotional support animal, the ALJ found as follows:

> Several letters from the claimant's therapists dated February 24, 2020, another one undated, and finally one dated September 16, 2022, were in the record merely stated the claimant was recommended or needed to have an emotional support animal (a cat) for his mental health impairments (17F). There was no description of the claimant's abilities, or lack thereof, to understand, remember, or apply information, interact with others, concentrate, persist, or maintain pace, or adapt or manage. Insofar at this might be considered to be opinion evidence, these are not persuasive since they are not functional analyses related to the claimant's ability to work, as his mental status exams were relatively unremarkable (15F/6-7; 16F/7, 11, 14; 20F/6, 12, 17, 20, 22, 28, 34-37, 40-42; 21F/33, 44, 55, 65, 76, 87, 97, 109). In addition, one of the letters stated the claimant met the definition of disability under the Fair Housing Act, but a decision by any other governmental agency about disability is based on that agency's rules and is not binding on the Social Security Administration (20 CFR 404.1504 and 416.904).

(Tr. 28-29.)

Regardless of whether the letters constitute opinion evidence, the ALJ weighed and analyzed these letters, finding them less than persuasive considering record evidence to which the ALJ cites and because the letters did not speak in functional terms as to Lippert's ability to work.  (*Id.*)  Reading the ALJ's

decision as a whole, the Court finds the ALJ explained the reasoning for finding an emotional support animal was not necessary.

Furthermore, the Court finds persuasive the recent opinion from the Eastern District of Michigan addressing a similar argument regarding the need for an emotional support animal:

> The Court agrees that Plaintiff fails to meet her burden to establish that an emotional support animal was medically necessary and thus should have been included in the RFC.
>
> Here, there is no dispute between the parties concerning an absence of Sixth Circuit authority establishing the exact standard for incorporating a claimant's need for a service animal in her RFC assessment. (ECF No. 13, PageID.706; ECF No. 15, PageID.730). However, Plaintiff acknowledges that, in *Horne v. Saul*, 2020 WL 1547068 (E.D. Tenn. Mar. 31, 2020), a district court within the Sixth Circuit "found harmless error where a plaintiff fails to point to evidence in the record of use of a service dog in treatment notes, or that the plaintiff ever actually utilized a properly trained service animal." (ECF No. 13, PageID.706).
>
> In *Horne*, the court found that the "[p]laintiff has failed to establish that a service animal was medically necessary" because "[t]he referenced letter to [p]laintiff's apartment complex that he requires a service animal does not detail that such an animal was medically prescribed or provide an opinion on the impact of a service animal on [p]laintiff's ability to work." *Horne*, 2020 WL 1547068, at *12 (citing *Cordell v. Saul*, 2019 WL 6257994, at *18 (N.D.W. Va. Nov. 4, 2019) ("Generally, a letter from a medical provider that suggests an individual's use of a service dog, without further testimony or documentation of the individual's need and use of the service animal, is insufficient to establish that the service dog is medically necessary.")). *See also Payano v. Colvin*, 2017 WL 4778593, at *4 (D. Nev. Oct. 23, 2017) (finding a recommendation that the claimant's dog be designated as a service animal "does not support an assessment that the dog is necessary for Plaintiff to work, nor describe how she would need any dog in a work setting" and as such "[a]ny failure to inform the vocational expert of the mere fact of having a properly-designated service dog was harmless error.").
>
> Like in *Horne*, Plaintiff here falls well short of her burden to establish a medical need for an emotional support dog. Plaintiff's assertion that she "proffered evidence in the record to show that an emotional service dog was medically necessary" based on Dr. Donald Cousineau's vague statement that he "feel[s]" Plaintiff "would benefit" from an emotional support animal and that one "could help with her symptoms" lacks merit. (ECF No. 13, PageID.707). Plaintiff herself characterizes Dr. Cousineau's letter as a mere "recommendation," not a prescription, and such letter does not establish an

actual medical necessity. (ECF No. 13, PageID.707). Nor does Dr. Cousineau's letter indicate how the use of an emotional support dog would bear on Plaintiff's ability to work. *Horne*, 2020 WL 1547068, at *12.

*Ashley D. v. Comm'r of Social Sec.*, Civil Action No. 22-11344, 2023 WL 5266849, at **9-10 (E.D. Mich. July 17, 2023), *report and recommendation adopted by* 2023 WL 5251849 (E.D. Mich. Aug. 15, 2023). As in *Ashley D.*, Lippert falls "well short" of meeting his burden of showing the medical necessity of an emotional support animal. Like the letter in *Ashley D.*, the letters by Lippert's therapists are not prescriptions and do not establish an actual medical necessity, nor do they "indicate how the use of an emotional support [animal] would bear on Plaintiff's ability to work." In addition, Hamms's letter is simply a *recommendation* for an emotional support animal, and it is based on Lippert having a "health condition that meets the definition of a disability under the Fair Housing Act." Furthermore, unlike in *Ashley D.*, the ALJ discussed Lippert's alleged need for an emotional support animal.

For all these reasons, the Court finds there is no error in the ALJ's determination that an emotional support animal was not necessary for inclusion in the RFC.

## VII. CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

Date: September 3, 2025

        *s/ Jonathan Greenberg*
Jonathan D. Greenberg
United States Magistrate Judge

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document. Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *Berkshire v. Beauvais*, 928 F.3d 520, 530-31 (6th Cir. 2019).**